IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF

V.                        NO. 12-50077

NICHOLAS HARPER                             DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Now before the Court is Defendant's Motion to Suppress and the Government's Response thereto.  (Docs. 13, 17).  A hearing on said motion was held on March 25 and March 28, 2013, and the matter is now ripe for report and recommendation.  After considering the testimony of the witnesses and the briefs and arguments presented by the parties, the Court makes the following findings and recommendations:

## I.   Application and Search Warrant:

On September 17, 2012, a search warrant was issued for #4 Violet Lane, Bella Vista, Arkansas.  (Court's Ex. 3).  The warrant was issued based upon an affidavit submitted by Special Agent Scott L. Crawford, with the Department of Homeland Security Investigations.  In the affidavit, Agent Crawford stated that an investigation by the Internet Crimes against Children (ICAC) task force had identified a computer that was offering to participate in the distribution of child pornography.  The suspect computer was identified by its internet protocol (IP) address, and records received from the

internet service provider, Cox Communications, identified the IP account as being assigned to Terry Martin at #4 Violet Lane, Bella Vista, Arkansas. According to the affidavit, the ICAC investigator was able to download two child pornography video files that this computer was making available. (Id.) The validity of the search warrant is not challenged in the motion to suppress.

II.  **Hearing Testimony:**

### Agent Crawford's Testimony

Agent Crawford testified that he called and spoke with Lt. Barbra Shrum, of the Bella Vista Police Department, and asked for her assistance in running the records for the suspect residence - #4 Violet Lane - to verify that it was Martin's residence. He told her he was conducting a child pornography investigation, and would contact her when he received the search warrant.

The night before Agent Crawford executed the search warrant at #4 Violet Lane, he contacted Lt. Shrum again and advised her that he was going to execute the search warrant the next morning, and asked her if she would be able to assist as a part of the ICAC task force team, to which she replied affirmatively.

On the morning of September 19, 2012, at around 5:30 am, Agent Crawford and members of the ICAC task force team, which consisted of local, state, and federal agents who were going to

-2-

assist Agent Crawford in the execution of the search warrant, met at a McDonald's in Bella Vista, Arkansas. At the meeting, they discussed the way the search warrant would be executed, and the responsibilities of each task force team member. The individuals who were members of that team and who were present at the meeting were Agent Crawford, Lt. Shrum, Detective Travis Monson, Special Agent Kevin Richmond, Detective Edward Williams, and Dennis Schumacher, a certified forensic examiner. Everyone at the meeting was involved in the operation. After the meeting, they all caravanned to #4 Violet Lane, where they observed a male, Terry Martin, in the driveway, getting ready to take his children to school. Mr. Martin was cooperative, and the agents identified numerous computers in his home. When Agent Crawford explained what they were searching for, Mr. Martin said he knew nothing about it and acknowledged that he had an unsecured wireless network, as his father-in-law had set up his router. During the search, Lt. Shrum was monitoring the other family members in the house, and Officer Schumacher was conducting the search of the computers.

It is not disputed that the task force team found no evidence of child pornography on Mr. Martin's computers, and they did not find a computer with the GUID[1] that had been

---

[1] As explained in the search warrant affidavit, a GUID is a "Globally Unique Identification" number of a computer that is produced when certain file-sharing software is downloaded onto a computer. (Court's Ex. 3 at pg. 9 ¶18). Government's Exhibit 1 is the GUID history of the subject computer.

identified in the investigation. Agent Crawford asked Mr. Martin to speak with him in the garage, and while they were speaking there, Agent Crawford and Det. Monson heard the sound of a loud exhaust, and noticed a red Dodge pick-up truck, with an Oklahoma tag, backing out of the driveway across the street and driving away.  Agent Crawford knew, based upon a geo-location check, that the subject computer had accessed the internet from Owasso, Oklahoma, on August 14, 2012. Agent Crawford had asked Mr. Martin if he had any connections to Oklahoma, to which Mr. Martin replied that he did not. Therefore, when Agent Crawford saw the Oklahoma tag, coupled with his knowledge that someone outside the #4 Violet Lane address had accessed Mr. Martin's wireless internet, Agent Crawford asked Det. Monson to run a check on the red truck's license plate. Det. Monson wrote down the Oklahoma licence plate number and called the Springdale Police Department dispatch, who identified the owner of the truck as Defendant. Det. Monson was also told that there was an outstanding warrant on Defendant for contempt of court, out of Rogers, Arkansas.

Det. Monson advised Agent Crawford of the outstanding warrant, and Agent Crawford then called the Rogers Police Department, and asked Det. Daniel Wilcox to verify the outstanding warrant.

After the task force team concluded the execution of the

-4-

search warrant at #4 Violet Lane, Agent Crawford told the other team members to contact the other neighbors in the area and to perform a "knock and talk," in order to attempt to determine who else might have used Mr. Martin's wireless internet. Agents Crawford, Schumacher, and Richmond then went to #3 Violet Lane, where they met with Teresa Smith, who identified herself as Defendant's fiancé, and stated they both lived at that address. The agents asked if she would consent to the search of their computer, to which she agreed. Ms. Smith admitted that when she and Defendant first moved to that address, they connected to Mr. Martin's wireless internet several times. She advised that they had just moved there from Owasso, Oklahoma. Ms. Smith also said that Defendant had a laptop computer, but she had not seen it since they moved to Arkansas. Ms. Smith advised Agent Crawford that Defendant had gone for a job interview at Lowe's.

Agent Crawford testified that while he was speaking to Ms. Smith, he received a call from Det. Wilcox, who advised him that the outstanding warrant was valid and "in hand." Agent Crawford then told Det. Wilcox to go to Lowe's and arrest Defendant. Det. Wilcox testified that he went to Lowe's to arrest Defendant, but was unable to find him there.

While the three agents were in Defendant's home visiting with Ms. Smith, the other officers of the task force team had completed their "knock and talk," and had gathered out in the

-5-

street, and were "hanging around," waiting for further instructions from Agent Crawford, and chatting about general things, including the investigation.

While Agent Crawford was speaking to Ms. Smith, he received a call from Det. Monson, who advised that Defendant had driven down the main street intersecting Violet Lane two times and did not turn in to Violet Lane. Agent Crawford further testified that while he was speaking to Ms. Smith, Defendant texted her, asking if she was "ok."

When Det. Monson asked Agent Crawford if he wanted them to stop Defendant, Agent Crawford answered affirmatively. Subsequently, Lt. Shrum, Det. Monson, and Williams stopped and searched the truck, and Defendant's laptop computer was found in the tool box in the back of his pick-up truck. Defendant was taken to the Benton County jail, and Agent Crawford spoke to Defendant, read him his <u>Miranda</u> rights and Defendant signed the form. (Gov't. Ex. #3). Defendant also signed a consent form allowing the officers to search his laptop computer that was found in the tool box. (Gov't. Ex. #4). The laptop had the GUID identified in the investigation and 48 videos of child pornography were discovered on the laptop. Defendant first told Agent Crawford that he was not downloading child pornography and had never seen child pornography. However, after being presented with what was discovered on his laptop, he apologized for lying

-6-

and confessed that he had downloaded child pornography.

### Detective Travis Monson

Det. Monson is on the ICAC task force team with the Springdale Police Department. He has been involved in over 50 child pornography investigations. Agent Crawford notified Det. Monson that he had a search warrant to serve, and asked him to meet him at McDonald's at round 5:30 am on September 19, 2012, for the purpose of briefing the team prior to executing the warrant.

Det. Monson testified that he initially assisted Officer Schumacher with the forensic examination of the computers at #4 Violet Lane. They did not find the computer with the GUID they were searching for, and it was discovered that the Martins had an unsecured wireless network. Det. Monson stated that he was going in and around the house assisting, and saw Agent Crawford in the garage with Mr. Martin. He joined Agent Crawford in the garage and heard a loud exhaust coming from a red pick-up truck that was backing out of the house across the street. At that point, Det. Monson was aware they had not found any child pornography on the Martin computers, as they had been communicating verbally periodically. Det. Monson and Agent Crawford saw that the truck had an Oklahoma tag, which Det. Monson wrote down. He called the Springdale Police Department dispatch with the license plate number, and was advised that it

-7-

was licensed to Defendant, and that there was an outstanding warrant for Defendant for contempt of court. Det. Monson stated that they did not arrest someone without confirming the warrant and physically holding the warrant. At that point, Agent Crawford contacted Det. Wilcox to confirm the outstanding warrant.

After concluding the search of the Martin's residence, Det. Monson walked the neighborhood to see how far the wireless signal reached. He and Lt. Shrum then conducted a "knock and talk" at neighboring houses. They then gathered back in the street. Det. Monson again heard the loud exhaust of a truck, which sounded like the same pick-up from across the street, and he walked up the hill to see the truck. Lt. Shrum and Det. Williams noticed it as well, and walked with him up the hill. When he saw the red pick-up truck, Det. Monson contacted Agent Crawford by phone and told him they had seen the truck drive by twice, and asked Agent Crawford if he would like the truck stopped. Agent Crawford said he would like it stopped. Lt. Shrum had been standing about two or three feet from Det. Monson while he was speaking to Agent Crawford.

When Lt. Shrum heard Det. Monson say to stop the pick-up, she got in her vehicle and proceeded toward it. Det. Monson testified that it was his understanding that they were stopping the truck based upon reasonable suspicion, as he was not aware

-8-

that Agent Crawford had confirmed the warrant with Det. Wilcox.

Det. Monson and Det. Williams followed Lt. Shrum, and by the time they arrived at the stop, Lt. Shrum had Defendant's vehicle pulled over and had approached the window of Defendant's vehicle. As Det. Monson approached Defendant's vehicle, Lt. Shrum was heading back toward them with Defendant's driver's license. Lt. Shrum went to her car to run the driver's license through her dispatch, and was told there was "no hit" from the Bella Vista Police Department. Det. Monson then contacted the Rogers Police Department, which confirmed the outstanding warrant over the phone. Det. Monson then notified Lt. Shrum to do a terminal dispatch back and forth for Bella Vista to confirm. The Rogers Police Department relayed confirmation of the warrant to Bella Vista.

Det. Monson had Defendant get out of the truck and go to the rear of the vehicle and sit on his tailgate. Det. Monson testified that Defendant was very cooperative and had no problems understanding him. Det. Monson chatted with Defendant about interviewing for a position at Lowe's, and the fact that he had moved to the area and was living with his girlfriend, soon to be fiance/wife. Det. Monson asked Defendant if he had anything illegal in the vehicle, to which he responded "no." Det. Monson asked for consent to search the cab of the truck, and advised Defendant he did not have to consent. Defendant gave

-9-

consent, and Det. Monson searched the cab and found nothing. Det. Monson next asked Defendant for consent to search the truck tool box, and Defendant granted him permission to do so. Defendant was again told he did not have to consent, but nevertheless gave it. Det. Monson testified that he advised Defendant of his right to refuse consent twice because he is required by law to advise a suspect of his right to refuse consent to search and he was trained on this requirement and understood the importance of it, as the failure to comply with it could jeopardize the whole case.

Det. Monson testified that the reason he did not have Defendant sign consent forms was because he was not in his vehicle, so he did not have them available. When Det. Monson searched the tool box, he found a backpack with a laptop and thumb drive.

### Detective Daniel Wilcox

Det. Wilcox was contacted by Agent Crawford between 7:20 and 7:30 a.m. on the day in question, to run a search on a license plate number. He had dispatch pull the outstanding warrant and made sure he had it in hand, when he called Agent Crawford back to tell him he had the outstanding warrant. At this time, Agent Crawford was speaking with a female in Defendant's house, and Agent Crawford told him that Defendant was supposed to be in Rogers applying for a job at Lowe's. Det.

-10-

Wilcox went to arrest Defendant at Agent Crawford's direction, but was unable to find him.

### Agent Kevin Richmond

Agent Richmond is a special agent with the ICAC task force, who assisted Agent Crawford in his search of #4 Violet Lane. He testified that all the members of the task force met at McDonald's the morning of the day in question.

While Agent Richmond was standing in the Martin garage with Agent Crawford, he observed a vehicle from Oklahoma across the street, and determined there was an outstanding warrant for the registered owner. Agent Richmond testified that Agent Crawford contacted Det. Wilcox and confirmed the warrant, and instructed Det. Wilcox to go to Lowe's and pick him up. Defendant's vehicle then drove by the area and Agent Crawford instructed Det. Monson to stop him.

### Lt. Barbra Shrum

Lt. Shrum has worked with the Bella Vista Police Department since 1985. She supervises the criminal investigation division, and was a member of the ICAC task force that searched #4 Violet Lane.

Lt. Shrum testified that Agent Crawford first contacted her regarding a child pornography case he was working on and asked if she could get with the Bella Vista water department to verify the name of a homeowner at #4 Violet Lane, for the purpose of

-11-

preparing a search warrant. On September 18, 2012, Agent Crawford called her back and said he was going to be executing a search warrant the next morning, and requested her assistance. She took Det. Williams with her to the meeting at McDonald's, and the purpose of the meeting was to make sure everyone knew what their duties were during the search.

When the team arrived at #4 Violet Lane, Lt. Shrum spent part of the time assisting Officer Schumacher in one of the bedrooms, and also supervised the family, trying to keep them in one spot. Lt. Shrum testified that Det. Monson was walking around with his I-phone, trying to find out if there was an open or closed wifi and discovered it was not a secure wifi.

Lt. Shrum understood that no child pornography was found on the computers at #4 Violet Lane, and after the search concluded, she and Det. Monson performed a "knock and talk" at a couple of houses in the area. A couple of the other task force members had gone directly across the street to the home where the red pick-up truck departed. After Lt. Shrum and Det. Monson finished the "knock and talk," they were standing in the street outside the homes, talking. Det. Monson had mentioned that some of the downloads on the computer were from the Oklahoma area. They heard the pick-up truck drive by on the street which intersected Violet Lane. Lt. Shrum could see the cab, and asked Det. Monson if he wanted her to stop him. He made a phone call to Agent

-12-

Crawford, and as Lt. Shrum started moving towards her car, Det. Monson told her to go stop the car. Lt. Shrum was aware of the warrant because it had been mentioned, although she did not know the details.

As Lt. Shrum proceeded to go toward Defendant's vehicle, she received a message from Det. Williams who said if it was "him," "they" were saying he had a warrant. She stopped the vehicle, identified herself, got Defendant's driver's license, and told him that some officers back at his house would like to talk to him. She went to her vehicle to run a records check and she was initially told there was no warrant. She told Det. Monson no warrant was found by her dispatch, and he advised her to have the Bella Vista dispatch contact the Rogers Police Department, who then advised Bella Vista dispatch of the confirmation of the warrant. Lt. Shrum turned the scene over to Det. Monson.

Lt. Shrum testified that prior to the suppression hearing, Mike Schriver, with the Federal Public Defender's office, visited her unannounced. She may have told him that the United States Marshal's Service was involved in the execution of the search. She explained that ICAC is made up of a lot of different agencies and she had worked with the Marshal's Service before. She acknowledged that she had memory issues when she spoke to Mr. Schriver because she suffered from "chemo brain." Mr.

-13-

Schriver asked her about the situation out of the blue and she did not have any notes or a chance to review anything. Lt. Shrum testified that she repeatedly told Mr. Schriver she really did not remember when he was asking her questions, explaining to him that it had been six months ago and it was not her case. Lt. Shrum testified that her memory was better on the date of the suppression hearing because when the team met prior to the hearing, her memory was refreshed as to the chain of events that day.

### Detective Edward Williams

Det. Williams works with Lt. Shrum at the Bella Vista Police Department. He met with the task force team at McDonald's, and his role at #4 Violet Lane was to stay with the family. When the search of #4 Violet Lane was completed, he went back out onto the street and was asked to go door to door to determine who had unprotected wireless. After that was completed, he stood in the street with Lt. Shrum and Det. Monson. Det. Williams and Det. Monson followed Lt. Shrum to Defendant's vehicle. Det. Williams made small talk with Defendant, and Defendant was communicating clearly. Det. Monson conducted the search. Det. Williams did not hear Det. Monson ask for consent to search, but it was possible Det. Monson asked, as he was talking to Defendant.

-14-

### Mike Schriver

At the suppression hearing, Defendant presented the testimony of Mike Schriver, an investigator with the Federal Public Defender's office, who had previously spent twenty years with the Springdale, Arkansas Police Department. It is not disputed that on February 22, 2013, in anticipation of the filing of Defendant's Motion to Suppress, Mr. Schriver went to visit with Lt. Shrum at the Bella Vista Police Department, unannounced. He began inquiring about her role in the investigation of Defendant and presented her a copy of the warrant that was outstanding on Defendant for contempt of court. He testified that Lt. Shrum stated she did not know anything about the warrant prior to stopping Defendant's vehicle. He further testified that she told him that she did not become aware of the warrant until some time during the traffic stop. Mr. Schriver also stated that Lt. Shrum told him that she was involved in the investigation to assist the United States Marshal's service, when, in fact, the United States Marshal's service was not involved. Mr. Schriver spoke with Lt. Shrum for approximately 15 minutes.

Mr. Schriver testified that he did not take notes contemporaneously with the interview, but rather waited until he went out to his car after the interview to make some handwritten notes. He did not write down the questions he asked Lt. Shrum,

-15-

but rather jotted down some handwritten notes, consisting of ½ page. (Court's Ex. 1). It was not until later in his testimony that Mr. Schriver advised the Court that he memorialized the interview in a typed memorandum, wherein he included additional information that was not included in his handwritten notes (Court's Ex. 2), such as the fact that Lt. Shrum stated that she "may remember" that agents had found "something related" to child pornography at the house, which Mr. Schriver noted was not correct.

Mr. Schriver testified that Lt. Shrum seemed to recall the events as he questioned her and that he did not recall her saying she did not remember, but it was possible that she did. In his typed memorandum of the interview with Lt. Shrum, Mr. Schriver stated, "She did not remember anything about the warrant." He then went on to state, "I then asked her when it was discovered that there was a misdemeanor warrant for the client out of Rogers. She could not recall the exact moment but she said that 'sometime during the stop we found out there was a warrant on him.'" (Court's Ex. 2). The Court questioned why Mr. Schriver would ask Lt. Shrum when she discovered the warrant if she had, in fact, already told him that she did not know anything about the warrant. Mr. Schriver testified that Lt. Shrum sat there and thought about it and then remembered that there was a warrant, but she could not remember when she found

-16-

out about it. The Court then asked Mr. Schriver if Lt. Shrum specifically stated that it was "during the stop" that she found out about the existence of a warrant, and Mr. Schriver said no, she did not specifically say that. When the Court pointed out that Mr. Schriver quoted Lt. Shrum as saying this in his typed memorandum, Mr. Schriver testified that if he put that statement in quotes, then Lt. Shrum must have specifically said that. The Court would note that this quote is not contained in Mr. Schriver's written notes of the interview; those notes simply reflect that Lt. Shrum stated "at some time we found warrant." (Court's Ex. 1).

### Defendant's Testimony

Defendant testified that on the morning in question, he left his residence at #3 Violet Lane to interview for a job at Lowe's. He stated that after his interview, he called Ms. Smith to tell her about the interview and she did not answer her phone. He tried calling her again, and still no answer. After that, he "texted" her and asked if she was "ok." He stated that he headed back to the main street that connected to Violet Lane, and went up and down that street, and passed Violet Lane twice. He stated that the reason he did not pull onto Violet Lane was because he and Ms. Smith were not getting along very well.

He testified that after he went past Violet Lane the second time, he saw blue lights flashing behind him, so he turned at

-17-

the next stop sign and pulled the truck over onto a grassy area. Defendant testified that Lt. Shrum then approached his side of the truck and was identifiable as a police officer, with a visible badge and gun on her.  She told him there was an investigation going on and she wanted to talk to him.  At about that time, two other officers showed up at the scene, one was Det. Monson and the other was Det.  Williams, and another marked police car appeared as well.  Defendant stated that none of the officers had their weapons drawn or told him to get to his knees, and that they were polite.  Defendant stated that he and Det. Monson chatted for a while, and then Det. Monson instructed him to get out of the truck and go to the back of the truck. He stated that Det. Monson never asked him if he had anything illegal in the truck, and never asked for consent to search the cab or the tool box in the back of the truck.  Defendant testified that he was intimidated because he was "surrounded" by police officers. Defendant could not remember if he placed the backpack in his truck that morning.

Defendant remembered that after being transported to the Benton County jail, Agent Crawford read his <u>Miranda</u> rights to him. He also testified that he lied to officers when he told them he did not download child pornography. Defense counsel stipulated that Defendant signed a consent to search form for the laptop and gave a statement at the jail.

-18-

Defendant testified that he had been arrested six years ago for shoplifting. Defendant was read his rights at the time of this arrest and pled guilty on this charge.

**III. Motion to Suppress:**

In his motion, Defendant asks the Court to suppress all evidence obtained by virtue of an unlawful traffic stop, which he alleges was not based upon reasonable suspicion. Defendant raises the following three arguments:

> 1. There was an invalid basis for the traffic stop;
>
> 2. The "Collective Knowledge Doctrine" does not apply; and
>
> 3. Consent does not cure the taint of the illegal stop.

(Doc. 13).

The Government argues that there existed sufficient probable cause to conduct the traffic stop because of the outstanding warrant; that the officers also had reasonable suspicion to conduct the traffic stop; and that the officers had consent to search the vehicle. (Doc. 17).

**IV. Discussion:**

**A.   Did Probable Cause Exist and Is the Collective Knowledge Doctrine Applicable?**

"[T]he decision to stop an automobile is reasonable when the police have probable cause to believe that a violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996).

-19-

The Government bears the burden of establishing that probable cause existed. <u>United States v. Andrews,</u> 454 F.3d 919, 922 (8th Cir. 2006).

It is not disputed that there was, in fact, an active outstanding warrant for Defendant at the time of the traffic stop. This, by itself, constituted probable cause to stop the Defendant. <u>See</u> <u>United States v. Kent</u>, 531 F.3d 642, 650 (8th Cir. 2008)(due to outstanding felony warrant, police had probable cause to arrest defendant when found). The Court credits Agent Crawford's testimony, as corroborated by Det. Wilcox and Agent Richmond, that Det. Wilcox confirmed the validity of the warrant to Agent Crawford before Agent Crawford gave the direction to stop Defendant. It is irrelevant as to whether Lt. Shrum, who was simply acting at Agent Crawford's direction, knew of the warrant[2] when she stopped the Defendant.

The collective knowledge doctrine is a well-established Fourth Amendment principle, stated as follows:

> "When multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of

[2]The Court notes that it does credit Lt. Shrum's testimony that she knew about the existence of a warrant before she stopped the Defendant. The Court found Lt. Shrum to be a very credible witness, who acknowledged having some memory problems from chemotherapy, but appeared to be very candid about the details she remembered after having met with the rest of the search team to refresh her recollection of the events that occurred. The Court does not believe that Lt. Shrum's credibility was called into question by Mr. Schriver's interview. Lt. Shrum testified that Mr. Schriver showed up to interview her unannounced and she had not had a chance to review anything to refresh her recollection of the events that had occurred several months prior, and that she repeatedly told Mr. Schriver in response to his questions that she really did not remember, as it had been so long ago and it was not her case. Further, there were inconsistencies in Mr. Schriver's testimony and his written notes and typed memorandum as to whether Lt. Shrum specifically said when she learned about the warrant.

the arresting officer as long as there is some
degree of communication."

United States v. Robinson, 664 F.3d 701, 703 (8th Cir.
2011)(quoting United States v. Frasher, 632 F.3d 450, 453 (8th
Cir. (2011), cert. denied 132 S. Ct. 278 (2011). The Eighth
Circuit in Robinson stated that it has never required that all
the relevant collective knowledge of the team be communicated to
the officer who made the stop, the arrest, or the search at
issue, and in that case, it was undisputed that the arresting
officer did not act independently. "When instructed to make the
stop, Roebuck became part of Detective Thomas's 'team' for
purposes of the collective knowledge doctrine." Robinson, 664
F.3d at 704.

There is an abundance of evidence to support the conclusion
that the collective knowledge doctrine is applicable in this
case.

The members of the ICAC task force team, which Agent
Crawford led, met at McDonald's the morning of the execution of
the search warrant to discuss the roles of the officers during
the search. In fact, Lt. Shrum had been previously contacted by
Agent Crawford for the purpose of confirming the resident of the
address where the IP address was located, and it is undisputed
that he told Lt. Shrum at that time that he was conducting an
investigation involving child pornography and that he would
contact her later to obtain her assistance with the execution of

-21-

the search.

The entire task force team caravanned to the address that was the subject of the search warrant after they met at McDonald's, and each individual took part in the execution of the warrant at #4 Violet Lane.

At the conclusion of the search, they were all aware that no child pornography was found on the computers at #4 Violet Lane, and they were instructed to conduct a "knock and talk" with neighbors to determine who else in the vicinity might have used the subject IP address.

Det. Monson, Lt. Shrum, and Officer Schumacher were standing in the street about two or three feet apart when Det. Monson called Agent Crawford and advised him that the red pick-up truck had passed by on the street that intersected Violet Lane.

Agent Crawford instructed Det. Monson to go and stop the vehicle, Det. Monson conveyed that information to Lt. Shrum, and Lt. Shrum proceeded to stop Defendant.

Clearly, although Lt. Shrum may not have had "all" of the relevant knowledge of the team, it is clear that she did not act independently when stopping Defendant.  Instead, she was part of Agent Crawford's "team," and made the stop based upon the great deal of collective knowledge of the team and Agent Crawford's direction.

-22-

Accordingly, the Court believes probable cause existed and that the collective knowledge doctrine applies.

**B.   Was there reasonable suspicion to conduct the traffic stop?**

In addition, Lt. Shrum had reasonable suspicion, based upon the team's collective knowledge, that criminal activity might be "afoot" when she stopped Defendant's vehicle.  In <u>United States v. Allen</u>, 705 F.3d 367 (8th Cir. 2012), the Eighth Circuit held:

> "An investigatory, or *Terry*, stop without a warrant is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot. When justifying a particular stop police officers 'must be able to point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion.' In deciding whether to conduct a *Terry* stop, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation."

<u>Id.</u> at 369 (internal citations omitted).

All of the members of the team knew they were involved in the execution of a search warrant for discovery of child pornography.  They all also knew that #4 Violet Lane had an unsecured wireless network, that nothing was found at that address, and that someone in the area had used the IP address located at #4 Violet Lane.  In addition, Ms. Smith admitted that she and Defendant had used the Martin's wireless internet, Defendant had a laptop computer, and Ms. Smith and Defendant had just moved from Owasso, Oklahoma, from where the subject

-23-

computer had accessed the internet. These facts, when taken together with rational inferences from the facts, reasonably warranted the traffic stop.

### C. Was Consent Given by Defendant to Search the Truck Cab and Tool Box?

Even if the above arguments fail, the Court is of the opinion that Defendant consented to the search of his vehicle.

> Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area. Moreover, a voluntary consent need not amount to a waiver; consent can be voluntary without being an "intentional relinquishment or abandonment of a known right or privilege." Rather, the proper test is whether the totality of the circumstances demonstrates that the consent was voluntary. In deciding whether a consent was voluntary, courts should require the prosecution to prove voluntariness by a preponderance of the evidence.

United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990)(internal citations omitted).

To satisfy the Fourth Amendment's protection from unreasonable searches, Defendant must have given consent that was the product of an essentially free and unconstrained choice. United States v. Correa, 641 F.3d 961, 966 (8th Cir. 2011). The Eighth Circuit has held that in determining whether consent to search was voluntarily given, "we consider the totality of the circumstances and particularly the defendant's age, education, intelligence, sobriety, and experience with the law; and ...context..., such as the length of questioning, the substance

-24-

of any discussion ... preceding the consent, whether the defendant was free to leave ..., and whether the defendant's contemporaneous reaction to the search was consistent with consent. Id. at 966-967 (quoting United States v. Va Lerie, 424 F.3d 694, 709 (8th Cir. 2005)(en banc); see United States v. Martinez, 168 F.3d 1043, 1047 (8th Cir. 1999)(finding defendant's prior experience with legal system relevant to issue of whether search was consensual). The question to be asked is "not whether [a defendant] subjectively consented, but rather, whether a reasonable officer would believe consent was given." Correa, 641 F.3d at 967 (quoting United States v. Pena-Ponce, 588 F.3d 579, 584 (8th Cir. 2009).

Defendant testified that six years prior to this incident, he was arrested for shoplifting a keychain. He stated that he was then read his Miranda rights and pled guilty. He was therefore familiar with law enforcement procedures. Defendant testified that after he had driven by Violet Lane the second time, he saw blue lights flashing behind him, so he turned at the next stop sign and pulled the truck over onto a grassy area.

Defendant testified that he was intimated because he was "surrounded" by police officers. However, Defendant also testified that each of the officers involved in the stop were polite. Although it is true that no written consent form was signed by Defendant to search the cab and tool box of the truck,

-25-

as Det. Monson did not have those forms immediately available to him at the time, Det. Monson testified that he had previously asked for consent in approximately 1,000 cases, and that he knew the consequences if he did not obtain consent. He knew the correct questions to ask the Defendant, and the Court finds it credible that Det. Monson asked the proper questions in obtaining Defendant's consent.

There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an "authoritative tone of voice." Correa, 641 F.3d at 965. There is no evidence indicating that the officers did anything to intimidate Defendant or say anything to suggest he could not leave.

Based upon the totality of the circumstances, defendant's age, education, intelligence, sobriety, and experience with the law, the length of questioning, the substance of the discussion preceding the consent, and Defendant's later consent to the search of the laptop, the Court finds Defendant voluntarily and freely gave his consent to search the vehicle and the laptop.

Accordingly, the undersigned believes Defendant's arguments are without merit.

**IV.  Conclusion:**

For the foregoing reasons, the Court hereby recommends that

-26-

the Motion to Suppress be denied in all respects.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Entered this 4th day of April, 2013.


/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-27-